Cite as 2021 Ark. App. 385

# ARKANSAS COURT OF APPEALS

DIVISION IV
**No.** CV–20–651

| | |
|---|---|
| | **Opinion Delivered** October 20, 2021 |
| JENNIFER MCKAMIE (NOW SHARP)<br>APPELLANT | APPEAL FROM THE COLUMBIA COUNTY CIRCUIT COURT<br>[NO. 14DR-19-152] |
| V. | HONORABLE HAMILTON H. SINGLETON, JUDGE |
| SHAUN MCKAMIE<br>APPELLEE | AFFIRMED IN PART; REVERSED AND REMANDED IN PART |

### BRANDON J. HARRISON, Chief Judge

Jennifer McKamie (now Sharp) appeals the Columbia County Circuit Court's order in her divorce from Shaun McKamie. She argues that the circuit court erred in its allocation of marital property and debt and the amount of alimony awarded to her. We affirm the circuit court's decisions on the debt and alimony but reverse and remand on the limited issue of the division of Shaun's vested pension.

In July 2019, Shaun filed for divorce from Jennifer after twenty-two years of marriage. He asked for custody of their two minor children and for the court to divide the parties' marital property and debt. Jennifer counterclaimed for divorce and asked for custody of the children; division of marital property and debts by the court, with an unequal division in her favor; and temporary and permanent spousal support.

At the temporary hearing on 21 October 2019, Shaun stated that Jennifer had been

injured during a surgery five years ago and had since become dependent on opioid medications. She had also been hospitalized seventy-six times between 2014 and 2019. During one of those hospitalizations, Jennifer spent over $17,000 buying clothing online and she did not remember doing so until the clothing arrived.

Jennifer explained that she had complications from a hysterectomy that damaged her bladder and that she developed a severe infection. She now has chronic urinary-tract infections, daily spasms in her bladder, and joint issues with her hip, knees, and ankles. She is prescribed several medications, including oxycodone, but she takes them only as prescribed.

Dr. Chester Wynn, Jennifer's primary-care physician and her employer, testified that he has known Jennifer for around twenty years and that she has been his office manager for thirteen years. He said that Jennifer's prescribed level of oxycodone is acceptable and does not impair her day-to-day functions.

The circuit court issued a temporary order awarding the parties joint custody of the minor children. The court also ordered that Jennifer and Shaun be responsible for the financial support of the children while in their care and that they both continue with their respective financial responsibilities.

The court convened a final hearing on 15 January 2020. The parties agreed that they had settled the issue of custody and that Jennifer would withdraw her counterclaim for divorce and waive corroboration of grounds. Shaun testified that he has an annual base salary of $127,600 and receives $3,905.17 bimonthly. He also earned $28,426 in bonuses for 2018, which he received in February 2019. His monthly expenses include $330 a month

for a loan taken on his 401(k); that loan was used to pay off the $17,500 worth of clothes that Jennifer had purchased online. Jennifer had to withdraw $33,052 from her Ameritrade 401(k) to pay credit card bills and attorney fees for a shoplifting charge, which left her a $15,000 balance. Shaun's 401(k) has a balance of $215,820.80. Shaun also has a pension fund with a $37,000 balance that is not available to him until retirement. He acknowledged he would have to pay alimony, and he opined, "Roughly twenty percent of what I've been paying now has been tough, but for a period of time I could tough that out, sixteen hundred a month is twenty percent of my take home base salary."

Jennifer agreed that her net pay is $1,088.89 and that she is paid twice a month. She also earns $250 a month selling makeup. In addition, Jennifer has a Charles Schwab IRA with a balance of $9,638.07 and an Ameritrade 401(k) with a $15,000 balance. She expressed concern over her ability to afford health insurance and car insurance in the future. Jennifer asked for a "fair amount" of alimony until either she remarries or she or Shaun passes away.

Dr. Wynn acknowledged that Jennifer had missed "a tremendous amount of work" over the past five years or so due to her medical issues, but he continued to pay her whether she was able to work or not. He testified that Jennifer generally works "thirty something" hours a week, and he expressed concern with her ability to work forty hours a week at another job if his practice closed.

The court held a final ruling in abeyance and asked the parties to file proposed findings of fact and conclusions of law. On 19 February 2020, the court approved the sale of the marital home to Jennifer's father for a purchase price of $310,000. The real estate

3

contract provided that Shaun would receive $45,000 for his interest in the property.

The court convened a second hearing on 15 July 2020 to discuss a change in Shaun's employment. Shaun testified that he had been fired from his former employment on February 6 and that he had received two weeks' pay as a severance. He immediately began seeking other employment and started a job with Community State Bank on February 19. His starting salary is $75,000, with a bimonthly net pay of $2,278.49. The children are covered on Shaun's insurance, but Jennifer is not. The updated balance of Shaun's 401(k) is $195,150. Shaun also recently filed the parties' joint tax return and paid almost $1400 in taxes.

Jennifer testified that she became aware she no longer had insurance around February 19 or 20. She has not been able to obtain her own health insurance and presented medical bills for $7,596.04 that she has incurred since losing the insurance. Jennifer explained that she waived any payment to herself from the sale of the house because she and the children have continued to live there. She maintained that she has an obligation to pay rent to her father but had been unable to do so. The current balances on her Charles Schwab and Ameritrade accounts are $9,570.65 and $15,873.60, respectively.

On cross-examination, Jennifer was questioned about her medical bills, specifically those billed by Dr. Wynn. She explained that she had not had medical bills from him before because "[w]e always had insurance and he always took insurance only and part of my benefits for working for him, one was that he took insurance payments only and did not charge me for the rest." She agreed that she had never paid a copay when seeing Dr. Wynn but also insisted that she had paid him in the past "with the Payflex card that Mr. McKamie

4

has."

The divorce decree, entered on 27 July 2020, included the following findings:

7.

The only debt to address is that created to pay on the 401K loan used to pay off the debt [Jennifer] made from her hospital bed, ordering clothes and other items for resale. Clearly this debt was created by [Jennifer] alone without [Shaun]'s approval. [Shaun] borrowed the necessary money to pay off their debt caused by [Jennifer]. As [Shaun] will be paying the loan back, it is only fair that he be able to deduct it from his 401K balance. See paragraph 8.

8.

[Shaun] and [Jennifer] both have retirement accounts. [Shaun]'s retirement account has a balance of $195,150. [Jennifer]'s retirement account has a balance of $24,321. As announced in paragraph 7, [Shaun] shall be able to deduct the loan to pay off [Jennifer]'s debt.

$195,150.00
– 17,500.00
$177,650.00

Further, rather than carve up [Jennifer]'s retirement account, [Shaun]'s interest in [Jennifer]'s retirement account can simply be deducted from his retirement account balance.

$24,321.00/2 = $12,160.50

$177,650.00
– 12,160.50
$165,489.50

After giving [Shaun] credit for the 401K loan to pay off [Jennifer]'s debt and deducting his interest in [Jennifer]'s retirement account, the balance of [Shaun]'s retirement account should be divided by 2, resulting in [Jennifer's] having a ½ interest in $165,489.50 or $82,744.75 as of July 15, 2020. . . .

9.

[Shaun] is responsible for ½ unpaid medical expenses except that

5

claimed by Dr. Wynn. Those expenses were incurred by [Jennifer] following that hearing on January 15, 2020, after [Shaun]'s employment was terminated with Farm Credit resulting in the loss of health insurance for [Jennifer]. . . .

It was clear from both parties that Dr. Wynn's bills were never paid for whatever the reason.

Finally, after calculating Jennifer's monthly expenses as $1,678.09 and Shaun's monthly expenses as $3,713.68, the court ordered Shaun to pay $600 a month as permanent alimony. Jennifer has timely appealed the circuit court's order.

## I. *Division of Marital Property and Debt*

Regarding the division of property in a divorce case, we review the circuit court's findings of fact and affirm them unless they are clearly erroneous or against the preponderance of the evidence. *Thomas v. Thomas*, 68 Ark. App. 196, 4 S.W.3d 517 (1999). A circuit court's finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed. *Dial v. Dial*, 74 Ark. App. 30, 44 S.W.3d 768 (2001). In reviewing a circuit court's findings, we defer to the court's superior position to determine the credibility of witnesses and the weight to be accorded to their testimony. *Keathley v. Keathley*, 76 Ark. App. 150, 61 S.W.3d 219 (2001).

Arkansas Code Annotated section 9-12-315 (Repl. 2020) governs the distribution of marital property. As a general rule, the court should distribute all marital property one-half to each party unless the court finds such a division to be inequitable. Ark. Code Ann. § 9-12-315(a)(1)(A). In that case, the court shall make some other division that the court deems equitable, taking into consideration a list of nine factors:

(i) The length of the marriage;

6

(ii) Age, health, and station in life of the parties;

(iii) Occupation of the parties;

(iv) Amount and sources of income;

(v) Vocational skills;

(vi) Employability;

(vii) Estate, liabilities, and needs of each party and opportunity of each for further acquisition of capital assets and income;

(viii) Contribution of each party in acquisition, preservation, or appreciation of marital property, including services as a homemaker; and

(ix) The federal income tax consequences of the court's division of property.

*Id.* The circuit court also has authority to consider the allocation of debt in the context of the distribution of all of the parties' property, and its decision to allocate debt to a particular party or in a particular manner is a question of fact and will not be reversed on appeal unless clearly erroneous. *McClure v. Schollmier-McClure*, 2011 Ark. App. 681.

A circuit court has broad powers to distribute property in order to achieve an equitable distribution. *Keathley*, *supra*. The overriding purpose of the property-division statute is to enable the court to make a division of property that is fair and equitable under the circumstances. *Id.* The statute does not compel mathematical precision in the distribution of property; it simply requires that marital property be distributed equitably. *Baxley v. Baxley*, 86 Ark. App. 200, 167 S.W.3d 158 (2004). If an unequal distribution of property is awarded, the court must state within its order the basis and reasons for not dividing the marital property equally. Ark. Code Ann. § 9-12-315(a)(1)(B).

In her first point, Jennifer argues generally that the circuit court's division of property

7

was inequitable but pinpoints the circuit court's failure to divide or mention Shaun's pension worth $37,000. She asserts that Shaun's interest in the pension is vested and that she should be awarded half of its value. Shaun seems to respond that not dividing the pension was part of the court's equitable distribution of marital property. This issue raises a concern. Given that the circuit court did not mention the pension in its final order, we reverse and remand on this limited issue and direct the circuit court to address it.

Next, Jennifer asserts that the circuit court erred in giving Shaun credit for the $17,500 loan taken from his 401(k). She contends that the debt was incurred during the marriage and is therefore marital debt; that the business venture had begun with Shaun's approval; and that the balance on the loan is $15,171, not $17,500.[1] Jennifer asserts that the circuit court should have considered Shaun's greater ability to bear the burden of the debt.

Shaun agrees that he did not object to Jennifer's resale business in the beginning. But he testified that he and Jennifer had discussed a $2,000 to $3,000 investment, "and it turned into fifty some odd thousand dollars in a year's time." He said that Jennifer was secretive about the business and had an account that she kept hidden from him. And she does not deny that she made the $17,500 purchase while hospitalized and without Shaun's knowledge. Shaun says that under these circumstances, the circuit court could have reasonably determined that the equitable solution was to "lay this debt" on the person who created it. The circuit court did not clearly err in allocating this debt to Jennifer.

Finally, Jennifer argues that the circuit court erred in its allocation of her medical

---

[1]The balance on the loan is lower because Shaun had been making payments, but the loan amount was $17,500.

8

bills incurred after the January 15 hearing. She asserts that from January 15 until July 15, 2020, the temporary order was still in effect, and that order required Shaun to pay for her health insurance. She also contends that the circuit court's finding that "Dr. Wynn's bills were never paid" was in error because she testified that she had paid Dr. Wynn on prior occasions. Jennifer urges this court to reverse with instructions that Shaun be responsible for 100 percent of the medical expenses incurred during that time period.

Shaun responds that the circuit court did not err and that Jennifer's testimony on this issue was inconsistent. She testified that she had not had medical bills from Dr. Wynn before because he did not charge her more than what her insurance paid. She later claimed that she had previously paid Dr. Wynn some amount, but there was no evidence of what those payments had been for or how much the payments had been. Shaun contends that the circuit court equitably distributed the medical debts using its considerable discretion and should be affirmed.

We hold that the circuit court did not clearly err in its allocation of the medical bills. Shaun followed the court's order and paid Jennifer's insurance until he lost his job, and at his new job, it was not possible to put Jennifer on his insurance plan. The court did order Shaun to pay half of the medical bills, except the amount billed by Dr. Wynn; this distribution reflects the unique nature of the payment arrangement between Jennifer and Dr. Wynn. For these reasons, we are not left with a definite and firm conviction that the circuit court made a mistake.

## II. *Alimony*

The decision to grant alimony lies within the sound discretion of the circuit court

and will not be reversed on appeal absent an abuse of discretion. *Taylor v. Taylor*, 369 Ark. 31, 250 S.W.3d 232 (2007). A circuit court abuses its discretion when it exercises its discretion improvidently, thoughtlessly, or without due consideration. *Stuart v. Stuart*, 2012 Ark. App. 458, 422 S.W.3d 147. The appropriateness of an alimony award is determined in light of the facts in each case, and the circuit court is in the best position to view the needs of the parties in connection with an alimony award. *Zimmerman v. Pope*, 2015 Ark. App. 499, 471 S.W.3d 646.

The purpose of alimony is to rectify the economic imbalances in earning power and standard of living in light of the particular facts in each case. *Taylor, supra.* The primary factors to be considered in determining whether to award alimony are the financial need of one spouse and the other spouse's ability to pay. *Kuchmas v. Kuchmas*, 368 Ark. 43, 243 S.W.3d 270 (2006). In addition, the following secondary factors should be considered: (1) the financial circumstances of both parties; (2) the couple's past standard of living; (3) the value of jointly owned property; (4) the amount and nature of the parties' income, both current and anticipated; (5) the extent and nature of the resources and assets of each of the parties; (6) the amount of income of each that is spendable; (7) the earning ability and capacity of each party; (8) the property awarded or given to one of the parties, either by the court or the other party; (9) the disposition made of the homestead or jointly owned property; (10) the condition of health and medical needs of both husband and wife; (11) the duration of the marriage; and (12) the amount of child support. *See Moore v. Moore*, 2016 Ark. 105, 486 S.W.3d 766.

On this point, Jennifer argues that Shaun, during the January 15 hearing, agreed it

would be fair and reasonable if he paid 20 percent of his take-home pay as alimony. Shaun's monthly income is now $4,556.98, and 20 percent of that amount is $911.40, which is more than the $600 a month the court awarded. She also asserts that the circuit court erred in allowing Shaun to claim certain expenses—such as their oldest son's living expenses—and in not allowing her certain expenses, such as rent. She also contends that she did not claim car insurance or health insurance as expenses but will have to acquire both at a monthly cost of at least $1,000.

First, we disagree that the circuit court was bound by any percentage that Shaun mentioned in his testimony. In any event, Shaun made the "20 percent" statement before his salary was reduced significantly. Jennifer is essentially asking this court to reevaluate the parties' claimed expenses and the circuit court's allowed deductions to calculate a higher amount of spousal support. We will not substitute our judgment for the circuit court's judgment on this issue given the record. *See Trucks v. Trucks*, 2015 Ark. App. 189, 459 S.W.3d 312. The fundamental question is whether the circuit court abused its discretion in determining the appropriate amount of alimony. Given the standard of review, the discretionary nature of alimony awards, and the evidence before the circuit court, we hold that the circuit court did not abuse its discretion. The alimony award is therefore affirmed.

Affirmed in part; reversed and remanded in part.

KLAPPENBACH and BARRETT, JJ., agree.

*Crane, Phillips & Rainwater, P.A.*, by: *Ryan Phillips*, for appellant.

*Gregory Thomas Attorney at Law PLC*, by: *Gregory M. Thomas*, for appellee.

11